Moncure, J.
I will first consider the case of Jincey & als. paupers v. Winfield's adm'r. & als.
Since 1782 an owner of slaves has been authorized to emancipate them in either of two modes prescribed by law, one of which is by last will and testament. This right of the owner is subordinate to that *713 of his creditors to subject his estate to the payment of his debts; and by express provision of the act of 1792, slaves so emancipated are “ liable to be taken by execution to satisfy any debt contracted by the person emancipating them, before such emancipation is made.” When slaves are emancipated by will they should not be sold for the payment of the testator’s debts, until all his other estate liable thereto has been applied to the purpose; and then should be sold only for such period as may be sufficient to raise an adequate fund to meet the deficiency; for “ all are equally entitled to their freedom, and they should have it partially, if they cannot receive it absolutely. Patty v. Colin, 1 Hen. & Munf. 519. “Ho court would permit the executor to manumit some and make slaves of others, but the burden of servitude should be equally distributed.” Nicholas v. Burruss, 4 Leigh 294. A court of chancery has jurisdiction to adjust the rights of the creditors and of the freed men. It will enjoin the creditor’s execution, even after it is levied on the freed men, until it can ascertain, by proper enquiries, whether there be any other property which should be applied to their exoneration; and will not utterly reject their claim “ until it is found that no possibility exists of effectuating their emancipation.” That such is the law, and such the mode of its administration, will plainly appear by reference to the cases of Woodley v. Abby, 5 Call 336; Patty v. Colin, 1 Hen. & Munf. 519 ; Dunn v. Amy, 1 Leigh 465 ; Elder v. Elder's ex'or, 4 Leigh 252 ; Nicholas v. Burruss, Id. 289 ; Parks v. Hewlett, 9 Leigh 511; Ruddle's ex'or v. Ben, 10 Leigh 467.
There can be no doubt therefore but that the appellants in this case would have been entitled to the relief claimed in their bill, if they had filed it before they were sold under the executions. For in any view that that can be taken of the case it is obvious that after *714 applying the other estate of the testatrix to the payment of her debts, it would be only necessary to sell them for a comparatively short period, to raise an adequate fund to meet the deficiency: And if the debt due the administrator be set down at the amount at which it is fixed by the decree of the court, it is not improbable that, including the hires which have accrued since 1848, (the last year for which hires are credited to the estate in the administration account,) there may be already a sufficient fund in the hands or power of the administrator to pay all the debts, including the amount of the satisfied executions.
The only question then is, whether the sale under the execution vested the purchasers with such indefeasible rights in the negroes sold as to deprive the latter of the relief to which they would have been otherwise certainly entitled ? I do not think that it did. Generally, if not universally, a bona fide pur-* chaser of the subject of a specific legacy from an executor, or under an execution against the goods and / chattels of the testator, would acquire a good title / against the legatee, notwithstanding it might be a ^ breach of duty in the executor to make the sale, or suffer it to be made. The law invests him with the <■ personal estate of his testator, and makes it his duty to apply the same, first of all, to the payment of the testator’s debts. Strangers cannot know the situation of the estate, and should, therefore, be generally pro-/ tected in their Iona fide purchases from the executor, y Specific legatees, who are injured by an improper sale J! of their legacies, may generally obtain indemnity out j of the remaining estate or from the executor. But J the right conferred by emancipation stands on different ^ ground, and requires the application of different rules and principles from those which govern the casektf a specific legacy. In the language of Tucker, P., in ^ which all the other judges concurred, 9 Leigh 521, *715 “ Emancipation is not strictly a gift of property: It •is the exoneration of a human being from the bonds which our institutions have fastened upon him, and which the beneficence of our times has authorized the master to remove.” It can make no difference that the executor has never assented to the emancipation of the slaves. They derive their right of emancipation from the will of their owner, and not the assent of his executor. Without such assent they may not be entitled to sue at law for their freedom, but may sue for it in equity, and will recover on showing that the debts are paid, or that there is other estate liable and sufficient for their payment, and having it applied to that purpose. The power of the executor to withhold his assent is given him that he may keep them together, to be ready, if necessary, to answer the claims of creditors; and in the mean time, of course, he may hire them out for that purpose. With or without such assent they are answerable for those claims, but answerable sub modo only, and upon condition that there is no other estate liable and sufficient for their payment. Subject to that liability they are free from the date or recordation of the will. They may be taken in execution if necessary, but should not be if there is other property liable thereto and sufficient for its satisfaction. They should not be sold absolutely, if a sale for a term would produce satisfaction; nor should some be sold while others are left free, but the burden of servitude should be equally distributed. These, I think, are the relative rights of the freed men and the creditors ; and if the former be sold in contravention of their rights, the sale may be set aside; at least upon the terms of refunding the purchase money and interest, and any expenses incurred on account of the freed men, after deducting hires and profits. The rule of caveat emptor applies to a purchaser of emancipated slaves, whether from the *716 executor or under, an execution against the goods and chattels of the testator. The purchaser knows, or is presumed to know, that slaves may be emancipated by will; and if so emancipated, cannot be sold^absolutely unless required for the payment-of the testator’s debts. It is his business to enquire whether or not the slaves so purchased are emancipated. He is a purchaser of the slaves with express or implied notice of their rights, which may be enforced against him, as against the executor or the execution creditor. If this were not so, the slaves, without their default, and without being required for the payment of debts, might lose forever the freedom intended to be bestowed upon them by their owner; and, unlike a specific legatee whose legacy is improperly sold, could obtain no indemnity; and the price of the slaves would enure to the benefit of the executor or the estate of the testator, contrary to his will that they should be free. On the other hand, the application of the rule of caveat cmptor to the purchaser would do him no damage which due caution on his part might not avoid, and would rarely do him any damage at all; for he would be entitled to indemnity out of the estate of the testator or against the executor.
But the case of Patty v. Colin, 1 Hen. & Munf. 519, is, I think, an express authority for affording relief against a purchaser, and seems to be decisive of the question under consideration. There, the slaves who claimed their freedom, belonged to John Timberlake at his death, and were bound for his debts, if his remaining estate was insufficient for their payment. They were sold under execution against his goods and chattels; and the purchaser at the sale sold them to Colin, a subsequent bona fide purchaser for valuable consideration; who, being a purchaser in the second decree, was a fortiori entitled to protection, if the purchaser under the execution was so entitled. The *717 slaves claimed to have been emancipated, not by John Timberlake, but by his widow and residuary legatee; and their rights depended upon the contingency that there was sufficient other estate of each to pay their respective debts; or that there was sufficient other estate of the widow to pay her debts, including the debt to her husband’s estate for these slaves, which she pretended to have purchased from his executor, but had not paid for. The court directed the proper accounts to be settled, and enquiries made, for the purpose of ascertaining whether there was any estate to be applied to the redemption of the paupers; and, if there should be, directed it to be so applied; but if not, confirmed the title of the purchaser. In that case, nothing was said about the assent of the executor- to the emancipation of the slaves; and I think it is plain that no importance was attached to any such assent, if it existed ; nor to any assent of the executors of J ohn Timberlake to the legacy to his widow, so far as to give it any effect in impairing the rights of the purchaser.
There might possibly be such laches or other circumstances in a case as to render it inequitable to disturb the rights of a purchaser; though a court of equity would be slow in imputing laches to persons of such ignorance and imbecility. In this case there is no ground whatever for doing so; nor are there any other circumstances unfavorable to the claimants. They were sold just ten months after the will emancipating them was admitted to record, under executions issued upon j udgments confessed by the administrator. The slaves were probably ignorant of the sale until about the time it was made. It had been advertised only at the court-house door, and but one month before the sale; and no person appears to have seen the advertisement, but one who was requested by the sheriff to read it. J. H. Fitzhugh testified that he was present at the sale, and heard several persons ask where the *718 negroes were advertised; had seen no advertisement himself; heard two others say they had seen none; and heard a good many people say it was not right to sell a portion of them to free the others. Of the thirteen neSroes fhat were sold, eleven were infants, and most of them of tender years. They were sold for 845 dollars less than they were then worth; though they pro<juce¿ 239 dollars 61 cents more than the amount of au the executions. The bill was filed iust a week, ana the affidavit annexed thereto hears date hut two days, after the sale. All the diligence that could be expected in such a case has been used by the plaintiffs in this; and the purchasers have no cause to complain of them on that score. They do not pretend that they did not in fact know that the negroes purchased by them had been emancipated ; though they no doubt supposed that the sale was valid.
I will now consider the case of Jones v. Jincey, &c. I think there is no error in the decree of the Circuit court in overruling the exception of the appellant, and sustaining the exception of the appellees to the commissioner’s report, and in instructing the commissioner to allow the appellant for his services from December 1841 to the time of his marriage in January 1842, at the rate of 408 dollars per annum; and for his services from the date of his marriage to January 1847, 100 dollars per annum; nor in the opinion therein expressed, that so much of his claim as was anterior to December 1841, was barred by the act of limitations.
The evidence in this case shows that the services for which compensation is claimed by the appellant were performed with a view to a legacy, and not in expectation of a reward in the nature of a debt. Fitzhugh proved that the appellant assigned as a reason for suing Ms aunt the testatrix, that she had made a will and set all her negroes free; said that he had left a good situation on the railroad to come and attend to *719 her business, and she could not expect him to attend to it for nothing, when she had left him nothing by her will; and that she had promised if he would come and live with her and attend to her business, she would do as well or better for him than he was then doing. John Winfield proved that while the appellant was living with the testatrix, he expressed a doubt whether she ever would make a will, and if she did not, he thought it probable he would not get paid for his services. The witness and another went to see her, and proposed to her to make some provision for the appellant. Her reply was, that she would do as well for him as he would do for her, and she refused to do anything at that time. Adkins proved that he was at her house a short time before the appellant went there to live. She told him she had written to her nephew the appellant, to come to live with her. Witness replied that he thought it would be a pity to take him away from the employment he was then in. She stated that she thought he would lose nothing by it; that all she had was for him and his sister at her death. R. E. Jones proved that he was on a visit to his aunt the testatrix, in January 1842, when she told him that after the death of her brother (who had lived with her) she wrote for the appellant to come and live with her, and take charge of her matters; that she would do as well or better for him than he had been doing on the Wilmington railroad; and that he had complied with her request, and was then engaged in doing her business. It was proved that the appellant, when he left the service of the railroad company, was receiving an annual salary of 480 dollars, and paid his own board, which was 72 dollars. The last two of the above named witnesses were introduced by the appellant. The foregoing is all the testimony tending to show a contract for compensation, except that of Haney Winfield, another witness for the appellant, *720 who stated that she was at the residence of the testatrix ™ 1839, a few days after the death of her brother; while there the appellant arrived. In a conversation with testatrix witness expressed a hope that testatrix would do very well by Patrick, he having said that he was getting 500 dollars on the railroad. Testatrix said she would give him more than that, and more than he could get anywhere else, as an inducement for him to leave the railroad and attend to her affairs. This testimony was given in 1849, ten years after the conversation occurred to which it refers; and it cannot be expected that the recollection of the witness, should be very accurate as to the particular words used. A slight verbal variation might have an important influence on the terms of the contract, if there was any, or in making a contract for the parties if there was none. But admitting the conversation to have occurred precisely as related, it is consistent with all the other testimony, which shows that there was in fact no contract, but a mutual expectation that the appellant would receive his reward in the shape of a provision for him in the will of his aunt.
But though it has been held that an action cannot be maintained for services performed with a view to a legacy, and not in expectation of a reward in the nature of a debt, Ckitty on Contracts 542 and cases cited, yet it has been also held that if performed at the request of the testator, or if'he has promised to pay for the services, either before or after they were performed, an action is maintainable. Id. 543, cases cited in note-The services were performed in this case at the request of the testatrix, and as she did not compensate them in the mode expected by both parties, it is right that he should receive reasonable compensation as a creditor of her estate. What compensation would be reasonable, under all the circumstances of the case, is the question to be decided. The court below referred the question as *721 to the appellant’s claim to a commissioner, who allowed 480 dollars par annum before, and 350 dollai'S per annum after, the appellant ceased to live with the testatrix Both parties having excepted, the court, after applying the bar of the statute of limitations to the claim, and thus excluding so much of it as had accrued more than five years before the date of the appellant’s writ against the testatrix, allowed the same rate of compensation which had been allowed by the commissioner for so much of the period during which the appellant lived with the testatrix, as was not excluded by the bar of the statute, deducting, however, for board, 'at the rate of 72 dollars per annum; but allowed only 100 dollars per annum afterwards. I think the allowance made by the court was reasonable, and fully as much as the evidence sustains. There can be no doubt of the propriety of the application of the bar of the statute of limitations; and that the date of the appellant’s wrrit was properly fixed as the period when it ceased to run. The court, I think, was also right in fixing on the salary which the appellant was receiving from the railroad company when he came to live with the testatrix, (after making the proper deduction for board,) as the standard for measuring his compensation while he continued to live with her. For although it was much more than a l'easonable compensation, looking either to the nature and amount of the services or their value to the testatrix; yet it was, perhaps, not unreasonable, looking to the facts that he gave up his situation in the employment of the railroad company to live with his aunt at her request; that she had repeatedly said he should lose nothing by doing so ; and that she desired his society, perhaps more than his services. But none of these facts apply to so much of the claim as is for services rendered after he ceased to live with her. The evidence shows that after the death of her brother she was left alone, and wanted the society of one of her *722 ber business. ° relations, as well as his assistance in the management She accordingly selected the appellant. It will be observed in referring to the testimony 011 both sides, that all her promises and declarations in regard to what she intended to do for him were in consideration of his coming to live with her: And John Winfield testified that the appellant left her alone, which she very much disliked; and she said to the witness that she desired the services of her nephew, the ajipellant, more to stay with her at night than any other time. He lived with her about two years, until January 1842, when he married, and ceased to live with her from that time till her death, in February 1847. Had he continued to live with her until her death, she would probably have made a satisfactory provision for him in her will, and we might never have heard of this suit. Having thus early ceased to live with her, there is no longer any reason for looking to any higher standard of value of his services afterwards rendered, than a quantum meruit.
What then was the value of his services after he ceased to live with her ? The witnesses differed very much among themselves in opinion on this subject, varying in their estimates of a reasonable yearly compensation from 50 dollars to 500 dollars. Most of the witnesses who placed a high estimate on the value of the services of the appellant, seem to have considered that he ought to be allowed at least as much as he had been receiving from the railroad company, without reference to the actual value of his services as an agent, of which some of them seemed to know nothing. It would be impossible, from these opinions, to come to any correct conclusion on the subject; and the better way of doing so is to ascertain the nature and extent of the services. The evidence shows that he had little or nothing to do with the management of her slaves or farming operations. She had two black *723 smiths’ shops and a hoot and shoemakers’ shop, and was in the habit of hiring out one, and sometimes two slaves; the income of all which and her farm was about 400 dollars per annum. She was the only white member of her family, and was extremely frugal; but was an indulgent mistress, and a bad manager of slaves; ■ and her income seems not to have exceeded, if it did not fall short of, her expenses. The appellant’s business chiefly was to keep the shop accounts, receive her income, and apply it to the payment of her expenses. It occupied a comparatively small portion of his time. He acquired by his marriage about twenty slaves, and a tract of land on which he after-wards resided, adjoining that of the testatrix. He attended to his own business as well as hers after his marriage; devoting but little time to hers, as one of the witnesses testified. The same witness thought he had the privilege of having his work done at her blacksmith and shoe shops free of charge. On the foregoing statement, I think that the allowance of 100 dollars per annum for his services after his marriage was ample. But this is not all. The appellant was the general receiving and paying agent of his aunt, and does not appear, to have ever rendered her any account. In fact, she does not appear to have ever required any of him; at least until after he sued her, and was no doubt willing that he should retain what he might owe on such account, as compensation for his services. If anything had been due to him thereon, it would probably have been charged as part of his claim against the estate exhibited before the commissioner. That claim is exclusively for his services, and is credited by nothing. The testatrix, when she was sued by the appellant, said she owed him nothing, and relied on what she claimed would be due her on a settlement of his agency transactions, as a sufficient setoff against any claim he might have against her for his services: *724 and she was preparing to make her defence to the suit when she died. Besides the money received on account of her shops, hires, &c., he received in 1845 the price of a negro sold by her for 400 dollars. Though her income was ecpial, or nearly so to her expenses, a large portion ©f the latter, during the whole period of his agency, remained unpaid at her death; and was the consideration of bonds given by him as her agent, on which judgments were confessed by him as her administrator; being the judgments (or greater part in number and amount of them) for the satisfaction of which, thirteen of the emancipated slaves were sold under execution. It is ¿u’obable, therefore, that a correct settlement of his accounts as agent would exhibit a balance against him to be applied to the credit of his claim for services; and if such a settlement could now be made, it would be proper to order it. But under the circumstances of the case, it cannot be expected, and the attempt to have it made would be attended with expense and delay, and probably be abortive. The fact however, that the appellant alone, if any person, can render an account of his agency; that he has rendered no such account,- and that he would probably be found to be indebted thereon, could a correct settlement be made, serves further to show that he certainly has no cause to complain of the allowance made for his services by the court below.
Upon the whole, I am for reversing so much of the decree as dissolved the injunction awarded against the appellees Field and Bagland, and dismissed the bill as to the appellants Jincey and her children, and the children of Seilla, and as directed the commissioner to encpiire into and report the fair market value of Seilla previous to her death, and affirming the residue thereof; and remanding the cause for further proceedings, according to the terms of the decree, which has been agreed upon in conference,
*725 The other judges concurred in the opinion of Moiicure, J.
The following is the deeree of the court:
The court is of opinion that the appellants in the first of the above named cases are entitled to freedom; subject only to a charge for the balance which may remain-unpaid of the debts of the testatrix Mary Winfield, after applying to their payment all her other estate, including the hires of the appellants since her death: that if such ether estate be insufficient for the payment of said debts, the appellants should be sold for such term of years as may be sufficient to raise an adequate fund to pay the deficiency, so as to distribute the burden of servitude as equally as possible among them1: that the sales of the appellants Jincey and her children to the appellee George Field, and of Scilla and her children to the appellee John D. Ragland, are valid only in the contingency that all the estate, including the emancipated slaves, shall be required for the payment of said debts, and are invalid in any other event; in which latter case the only effect of said sales is to satisfy the said executions, and make the said purchasers creditors of the estate of the said testatrix by the amount of the purchase money paid by them respectively, with interest thereon from the time of such payment and of the expenses incurred, after deducting hires and profits received by them respectively on account of said negroes since the sale: that all proper accounts should be taken to effectuate the purposes aforesaid: that so much of the said decree of the Circuit court as directs the commissioner to enquire into and report the fair market value of the plaintiff Scilla previous to her death, and as dissolved the injunction awarded against the said Field and Ragland, and dismissed the bill as to the said Jincey and her children and the children of Scilla, is erroneous, and that there is no error in the *726 residue of the said decree. Therefore so much of the said decree as is above declared to be erroneous is reversed, and the residue thereof affirmed, with costs to the appellants in the first and the appellees in the last of the above mentioned cases. And the causes are remanded for further proceedings on the principles" above indicated.